CASE No. 1022.

SMITH v. GRANT.

1. Where a jury case is submitted by consent to the Circuit judge to be decided by him, his judgment, dismissing the complaint, is, in effect, a verdict for defendant.

2. If, in such case, this court finds error of law in the decision of the Circuit judge, it will declare the error and remand the case for correction, but cannot order an original judgment for the plaintiff.

3. A devisee is the legal owner of the lands devised, and has as full power of alienation as had the testator himself, subject only to the rights given to creditors by the statutes 3 and 4 *W. & M., c.* 14, and 5 *Geo. II., c.* 7. These statutes and the cases thereunder considered.

4. After judgment obtained by A against executors upon a debt of their testator, a devisee of land under the will, who was also one of the executors, filed his petition in bankruptcy and included in his schedules this land, and also as debts for which he was liable, the judgment of A, and a debt due by his testator to B. By order of the Bankrupt Court, but without notice to B, this land was sold and the proceeds applied to A's judgment. *Held*, that the bankruptcy proceedings were a *bona fide* alienation, and the sale thereunder transferred a good title, notwithstanding B had recovered judgment against the executors before such sale was made.

5. The alienation must be *bona fide* and before action brought against the devisee to charge the lands devised, but knowledge by the devisee of a debt of his testator does not invalidate the conveyance.

6. Payment of debts for which the devisee, as such, is liable, is a sufficient consideration to support an alienation.

Before FRASER, J., Georgetown, March, 1880.

This action was commenced March 8th, 1879, by E. B. Smith against James E. Grant, for the possession of a tract of land known as Richmond Hill, and for damages. The answer was a general denial. By consent a trial by jury was waived and all issues of fact and law were to be tried by the court, "whose decision shall be given in writing, and have the full force and effect of a verdict by a jury."

The following is the judgment of the Circuit Court:

This case was heard by me at the term of the Court of Common Pleas for Georgetown county, held in March, 1880. It is an action for the recovery of real estate, and, by consent of counsel in writing, was heard by the court without a jury. The facts are these : The action was brought for the recovery of a tract of land, described in the complaint as situated in Georgetown county, " on Waccamaw river, known as Richmond Hill Plantation," containing two hundred acres of rice land, more or less, and six hundred acres of upland, more or less, bounded, &c. Both parties claim through John D. Magill, the elder, who died in the latter part of 1863, leaving a will, in which John D. Magill, the younger, and William J. Magill, were appointed executors, and by which will the said plantation was devised to John D. Magill.

The testator owned, at his death, other real estate and some

personalty.    There were two specialty creditors of the testator—
the Bank of Charleston and Charles Betts—whose claims were
sued to judgment against the executors.    The Bank of Charleston
recovered judgment on April 3d, 1868, for $7009.50, and costs.
Charles Betts recovered judgment June 29th, 1869, for $1120,
and costs.    Execution was issued on the first of these judgments
at its date; on the other, June 30th, 1869.    There were also two
creditors of the testator by simple contract, but their claims
were not put into judgment.    At this point the Bank of Charles-
ton and Charles Betts pursued different remedies for the collec-
tion of their claims.    The plaintiff claims under the latter, the
defendant under the former.    On September 16th, 1868, John
D. Magill, the devisee of the Richmond Hill plantation, and one
of the executors of testator's will, was, on his own petition, adju-
dicated a bankrupt.    About this time William J. Magill, the
other executor, was also, on his own petition, adjudicated a bank-
rupt.    Robert E. Fraser was appointed assignee of both estates.
In the schedule of John D. Magill is included the Richmond
Hill plantation, with the remark, " inherited from my father, the
late John D. Magill."    In the schedule of debts of John D.
Magill is included the two specialty debts of the testator, and
three debts due by the bankrupt; one of which is a bond for
$5000, due to Susan and Caroline Shields, secured by a mort-
gage of Richmond Hill plantation, executed by the bankrupt.
In reference to the debt due by the testator to the Bank of
Charleston, it is stated in the schedule that the same is in judg-
ment against the executors; and in reference to the other debts
of the testator, it is stated that the bankrupt is presumed to be
liable as one of the executors of the estate.    After these proceed-
ings in bankruptcy were commenced, a petition was filed in the
Bankrupt Court by the Bank of Charleston for the use of E. M.
Beach, assignee, in the matter of the bankrupt estate of John D.
Magill and William J. Magill, asking the court to set up the
judgment above referred to obtained against the executors as a lien
on Richmond Hill plantation and other property of the testator.

After reference the register in bankruptcy made a report, that
the said judgment was " a valid and subsisting lien " on all the
property of testator, and that it had priority over all others.    On

this report an order of sale was made on June 18th, 1869, for the sale of all the property included in the schedules, and known as a part of testator's estate, and for the payment of this judgment of the Bank of Charleston. Two orders were subsequently obtained in the Bankrupt Court, one by Messrs. Simonton & Barker, and one by Messrs. Porter & Conner, attorneys for "other creditors," modifying the terms and time of sale. There is no evidence before me to show who were those "other creditors;" and there is no evidence before me to show that either Charles Betts or Susan or Caroline Shields were made parties to this petition of the Bank of Charleston, or in any way consented to the proceedings. Four creditors of the testator were named in the schedule of John D. Magill and four of his individual creditors, and the receipt of the marshal for eight notices served by him, may be taken as notice of the application of the bankrupt for his adjudication as a bankrupt and discharge, as to all who were named in the schedule as creditors. Under the order of sale and modifications above referred to, a sale was made by the assignee, R. E. Fraser, after due advertisement, of Richmond Hill plantation and other property, on November 15th, 1869. At this sale the Richmond Hill plantation was purchased by Robert Chisholm, and conveyed to him the same day by the assignee. Upon the assignee's report of sales the same was confirmed, and an order passed that the net proceeds be paid to the judgment of the Bank of Charleston. Charles Betts purchased at a sale in May, 1869, from the assignee, one gray horse at $75; but it does not appear by any evidence that he received from the assignee anything on account of his claim against the testator's estate. Robert Chisholm conveyed to William J. Magill February 13th, 1872. William J. Magill conveyed to James E. Grant, the defendant, in July, 1874. After these proceedings in the Bankrupt Court, under which defendant claims, Charles Betts issued a summons, had the same served on W. J. Magill, one of the defendant executors in his judgment, and obtained from the Court of Common Pleas for Georgetown county, of date April 4th, 1878, an order "that the execution set forth in the summons be renewed, revived and continued against the defendants, according to the force, form and effect of the former

recovery."* Under this order an execution was issued, dated
April 18th, 1878, in which the judgment of Charles Betts
against the executors was properly recited, except as to the date
of the judgment, which was June 29th, and not June 30th, 1869;
and the sheriff was commanded to "satisfy the said judgment
and his fees out of the personal property of the defendant within
his county, or if sufficient personal property cannot be found,
then out of the real property in his county belonging to such
defendants, in whose hands soever the same may be." In reciting
the judgment, it is described as a judgment rendered between
Charles Betts, plaintiff, and W. J. Magill and John D. Magill,
executors of John D. Magill, deceased, defendants, in favor of
the plaintiff and against the defendants, for the sum of $1120, as
appears by the judgment-roll. On the original execution was
endorsed, "Renewed by order of court April 4th, 1878." On
the renewal execution above described was endorsed, "Levied on
Richmond Hill plantation 11th Nov., 1878," which was signed
by the sheriff. On January 6th, 1869, Richmond Hill planta-
tion was, after due advertisement, sold by the sheriff and bid off
by E. B. Smith, the plaintiff, executor of Charles Betts, for $1120.
E. B. Smith paid the costs, and gave receipt for the balance of
the purchase money, and on January 14th, 1879, the sheriff con-
veyed to him Richmond Hill plantation. It was admitted that
James E. Grant went into possession in July, 1874, and has con-
tinued in possession until the commencement of this action. The
rental of the premises was worth $100. These are the facts
which seem to me to be material to the case.

The plaintiff in this case must show that his chain of title is
good, and also that the defendant, who claims by an older title
from the common source, is not in under a good title. The plain-
tiff, so far as the facts have been made to appear to me, has pro-
ceeded regularly until the issuing of the execution of April 18th,
1878. The first execution in this case was dated June 30th,

---

* It should be noted here that Charles Betts and John D. Magill, the bank-
rupt, both died before the proceedings for renewal of the Betts execution,
which was renewed at the instance of E. B. Smith, the executor of the estate
of Charles Betts, against William J. Magill, the surviving executor defendant,
of the estate of John D. Magill, the elder.

1869, and the judgment under which it issued was dated the day before, viz., June 29th, 1869. The execution had, therefore, lost its active energy, and could not be renewed as a matter of course, when the proceedings were instituted, under which the execution was issued under which the land was sold. Under the practice before the code, it was allowable either to bring an action of debt on the judgment or to revive by *scire facias*. In either there was a judgment, and under this judgment a new writ of execution was issued. The proceedings did not, in either case, give new life and energy to the old execution, but a new precept to the sheriff was necessary. By Section 306 of the code, all executions on judgments then existing, or thereafter to be obtained, are to be issued in conformity to the code. By the act of 1873, page 499, Section 15, the mode of renewing executions is prescribed, and, as I construe the section, upon failure to show cause after service of a summons, the plaintiff may obtain an order to renew the execution. While this section seems to operate directly on the execution, and not indirectly by reviving the judgment, as formerly, I do not see how it can be so construed as to give new life and energy to an old execution which had become dormant. The meaning of the word "renew," I take it, is to issue a new execution under the seal of the court, under the authority of the order to renew, and that the mere entry of the word "renewed" on the old execution cannot have the effect of giving it new life and active energy, though its lien may be preserved. If this view is correct, then the only authority of the sheriff to sell was derived from the execution issued under the order to revive, and under which the sale was made. The well-established rule is, that the judgment must authorize the execution or it will be void. *Freem. on Executions*, § 43. The original judgment in this case authorized the collection of the debt out of the assets of the testator. The execution under which the sale was made authorized the collection out of the individual property of the executors. The execution said nothing about the levy on the goods or lands of the testator. Subdivision 2 of Section 312 of the code, directs that when a levy is to be made of real and personal property in the hands of personal representatives, * * * it shall require the officer to satisfy the judgment out of such prop-

erty. If an execution issued against property of individuals under Subdivision 1, could authorize a levy of property of a decedent under Subdivision 2, I do not see any reason for these distinctions in the different Subdivisions of that section, or why an execution against the property under Subdivision 1 would not justify an arrest of the person under Subdivision 3. It is true that the defendants are styled " executors," but this has been held, time and again, to be a mere " *descriptio personæ.*" *Beazley* v. *Dunn*, 8 *Rich.* 346; *Ab. Forms* 140, note; *Olmstead* v. *Vreden-burgh*, 10 *How. Pr.* 217.

There may have been a good reason for establishing such a rule, though I cannot see now any valid reason for retaining it, and it seems to be against the whole spirit of the code. It is not the practice in these days to add any words of description to the names of parties to an action who are sued individually; and it seems to me that such words ought to be held to show the character in which the defendant is sued. Yet I do not think that I am at liberty, in the face of these cases, to hold this to be any other than an execution against the executors individually.

Besides this, the judgment described in this execution bears date June 30th, 1869; and the judgment offered in evidence as the foundation of these proceedings, bears date June 29th, 1869, and may or may not be the same. If these views be correct, then the plaintiff's case fails.

I will therefore dispose very briefly of the defendants' title, as it is perhaps better to rule on all the points which may be material to the case.

It is claimed that John D. Magill, who was adjudicated a bankrupt, and who puts this tract of land on his schedule, was a devisee of the testator; that the debt under which the land was sold by order of the Bankrupt Court constituted a lien, and that court had a right to sell it for the purpose of extinguishing the lien; and that the transfer of title to the assignee in bankruptcy amounted to an alienation, such as is contemplated by 3 and 4 *W. & M.*, and which is sufficient to protect the purchaser who holds under it. I take it to be law that the heir or devisee holds real estate descended or devised as assets of the deceased, and subject to the payment of his debts, with full power of *bona fide*

alienation before action, which belonged to the executor or administrator before the power of sale was restrained by statute. If the sale was for value, and without any circumstances to show a misapplication of the fund, the purchaser is protected and the fund may be followed. The presumption is, when a fair sale is made or money raised on mortgage which is foreclosed, that it is for the purpose of the trust. This does not give a right to use it for the payment of individual debts of the heir, devisee or personal representative, or to execute an assignment to another, who is to assume his duties on the payment of the decedent's debts. There should be not only a complete conveyance of the legal title, but there should be some such new consideration passing to the heir, devisee or personal representative as will, of itself, raise the presumption that the transfer of title is for the purpose of the trust. 2 *Bl.* 244; *Richardson* v. *Chappell*, 6 *S. C.* 158; *Rhame* v. *Lewis*, 13 *Rich. Eq.* 296; *Warren* v. *Raymond*, 12 *S. C.* 9; *Lanier* v. *Griffin*, 11 *S. C.* 566.

Now, the transfer of title to the assignee in this case was for no new consideration, such as would impress upon the transaction the character of a sale for the purposes of the trust. If I am correct in this view, that the land was held as a trust with a power of sale, the devisee, John D. Magill, had no power to transfer this power, either directly or indirectly, to another; and in this respect his power over the assets is analogous to the power of the personal representative over the choses in action which he may sell or alien *bona fide*. *Rhame* v. *Lewis, supra*. If, then, the devisee stood in relation to this land as a trustee, there was no such lien as the Bankrupt Court had a right to foreclose by sale. In this view there was no more jurisdiction over the subject matter than there would be over the choses in action of an estate which a personal representative should see fit to include in his schedule in bankruptcy. In one aspect of this case, perhaps the Bankrupt Court could have ordered a sale and made good title under it. The bond of Susan and Caroline Shields for $5000, which was the individual debt of John D. Magill, the devisee, was secured by a mortgage of the "Richmond Hill Plantation;" and I am not prepared to say that a sale under this mortgage, by the Bankrupt Court, would not have perfected the

title. But the only party known to this proceeding under which the sale was made, was the Bank of Charleston. There is nothing to show who were the " other petitioners " or other creditors, represented by Messrs. Porter & Conner, and Simonton & Barker. There is no evidence that Charles Betts was in any way made a party to this proceeding, or that Susan and Caroline Shields were served with notice or were in any way represented in the case. The assignee had no power to sell property under lien without an order of the court, made at the instance of or with due notice to the lien creditor. As no such notice appears in the case, I do not think the title of the defendant is in any way strengthened by the fact that Susan and Caroline Shields, who were individual creditors of the bankrupt, held a mortgage of the Richmond Hill plantation. I have already said, however, that in my view of this case the plaintiff has failed on account of the insufficiency of the execution under which he holds, to connect him with the judgment on his sealed note against the testator.

It is therefore ordered and adjudged that the complaint be dismissed, with costs.

Plaintiff appealed.

*Mr. Joseph T. Walsh,* for appellant.

*Mr. Richard Dozier,* contra.

April 18th, 1881. The opinion of the court was delivered by

McGowan, A. J. This was an action for the possession of a plantation in Georgetown county, known as "Richmond Hill." A trial by jury was waived, and the case was heard and decided by Judge Fraser. The facts are somewhat complicated, but are so clearly stated in the Circuit judgment that it is unnecessary to repeat them here, except so far as to make this opinion intelligible. The plantation originally belonged to John D. Magill, Senior, under whom both parties claimed. He died in the latter part of 1863, leaving a will, in which John D. Magill, Junior, and William J. Magill were appointed executors, and by which the said plantation was devised to John D. Magill, Junior, and,

we suppose, went into his possession, soon after his father's death. Two judgments upon debts of the testator were afterwards recovered against the executors.

On April 3d, 1868, the Bank of Charleston recovered judgment for $7009.50.

On June 29th, 1869, Charles Betts recovered judgment for $1120.

The plaintiff claimed Richmond Hill under a sale by the sheriff January 6th, 1879, by virtue of a renewed execution in the case of Charles Betts, insisting that Charles Betts, as a creditor of John D. Magill, Senior, by judgment obtained against his executors after his death, had the right to sell the land devised by the debtor, the father, to his son, wherever the officer might find it, in the possession of the son, or of any other person.

The defendant claimed under a sale made in bankruptcy in the manner following: In 1869 John D. Magill, devisee in possession of Richmond Hill, went into bankruptcy, and included the plantation in his schedule. The assignee in bankruptcy sold it. The sale was confirmed, and the proceeds paid to the judgment of the Bank of Charleston, which had been proved as the oldest lien against John D. Magill, Senior, in the bankrupt proceedings in the matter of John D. Magill, Junior. In the schedule of debts of John D. Magill are included the two specialty debts of the testator above referred to. In reference to the debt due the Bank of Charleston, it is stated in the schedule that the same is in judgment against the executors. At the assignee's sale, Robert Chisholm purchased Richmond Hill and conveyed it to W. J. Magill, and he to James E. Grant, the defendant, February 13th, 1872, who is still in possession. The defendant insisted that a creditor having recovered judgment against the executors of John D. Magill, Senior, *after* Richmond Hill had gone into the absolute and exclusive control of John D. Magill, Junior, the devisee, could not buy and sell it without an action against him as devisee; but that if he could, the assignment and sale in bankruptcy amounted to a *bona fide* alienation by the devisee before action brought against him, and Charles Betts could not follow the land thus alienated by the devisee. He also insisted that the renewed execution upon the judgment

of Charles Betts, under which the plaintiff purchased, was fatally defective, and for that reason the sheriff's deed conveyed no title.

Judge Fraser held that the plaintiff could not recover, the execution under which he purchased being fatally defective, and ordered the complaint dismissed; but he went on and held the other questions for the plaintiff, who, conceiving that the merits had been decided in his favor, filed no regular exceptions. He seeks now to correct the judgment as to the alleged irregularities in the form of the execution and to obtain from this court an order to enter judgment for him, the plaintiff, upon the following "questions made by plaintiff's appeal :"

"1. When a case, strictly a jury case, is submitted by consent to be heard by a judge as by a jury, can the judge, in the absence of a motion to that effect at the close of the plaintiff's testimony (and after the defendant has submitted his testimony), dismiss plaintiff's action or order nonsuit ?

"2. Was the renewal execution in this case so materially defective as to render the sale and deed under the sale to the plaintiff void as being made without authority ?

"3. Having found the material points of law and fact in favor of plaintiff, acting as a jury as well as judge, should he not have rendered a verdict for plaintiff ?

"4. If the Supreme Court holds that the defects in the renewed execution are not fatal to plaintiff's title, can it not reverse the judgment of the Circuit Court wherein it dismisses the action only on account of said defects, and order judgment to be entered for plaintiff ?"

In addition, however, to these interrogatories, there is an agreement in the case that all the questions made below may be heard in this court. We shall, therefore, consider the interrogatories as regular exceptions.

1. We do not know that there is in the trial of a case any particular time at which a nonsuit must be moved for. In a trial before a jury it is usually done when the plaintiff closes his testimony. This case was heard by the court. When the plaintiff closed his evidence the defendant made no motion for a nonsuit. The judge took the papers, and afterwards delivered his judgment, in which he ordered the complaint dismissed. If

the judge's decision must be regarded as strictly the verdict of a jury, it was, in effect, a verdict for the defendant; and the form in which it was made does not alter the case.

2. All the authorities agree that a purchaser at sheriff's sale is not required to look closely for mere irregularities in the forms of process under which property is sold, and the court is always reluctant to decide a case involving valuable rights upon such grounds. But, from the view taken of other questions, it will not be necessary to consider the alleged defect in the renewed execution.

3. An execution in proper form to authorize sale by the sheriff was necessary, especially in a case like this, where land in the possession of one man was to be sold to pay the debt of another. If the judge conceived that the sheriff held no such process, he could not have rendered a verdict or judgment for the plaintiff.

4. The appeal court in a law case has only authority to consider alleged errors of law, and has no right to order an original judgment for plaintiff. If the Circuit judge committed error in reference to the execution or otherwise, this court would perform the whole measure of its duty by declaring the error and remanding the case for correction below.

5. Judge Fraser decided that a devisee holds his devise as a trustee with power of sale for the creditors of the testator, and can make no *bona fide* alienation of the devise without *new consideration*, which must enure to the benefit of the testator's creditors; and that, therefore, the assignment and sale in bankruptcy of Richmond Hill for the benefit of the creditors of the devisee, including those of the testator, for which he had become liable, was not a *bona fide* alienation so as to place it beyond the reach of a judgment recovered against the executors of the testator. Was this error?

We do not think that, as a rule, the devisee holds his devise as a trustee for the creditors of the testator. He is the legal owner of the land, which is not charged with the testator's debts, and has the same right to sell as had the testator himself, subject only to the rights given to the creditors, by the statutes 3 and 4 *W. & M.*, c. 14; *Gen. Stat.* 463; and that of 5 *Geo. II.*,

c. 7; 2 *Stat.* 570. By the common law land was not liable at all for debts. *Fieri facias* only reaches goods and chattels. *Levari facias* reaches the profits of lands. A debt of itself gave the creditor no right to take land; but if the debtor made a specialty, and stipulated to bind "his heirs," &c., the heir was bound as by his own obligation. He was not answerable at all under an execution against the executor, but as of his own obligation he was bound to the extent of lands he inherited; the plea of *riens per descent,* if true, excused him. If he took land and aliened *bona fide* before action brought he was released, and stood as if he had received nothing by descent. This rule of making the heir liable for the obligation of his ancestor to the extent of lands received by descent did not include the case of a devisee. After the statute of wills it was competent for any one seized in fee to devise land, but the devisee was not bound to pay the debt of testator, even to the extent of lands received, for the double reason that he was not named in the bond of the debtor, and because the devise was in the nature of a direct conveyance; 3 *Bl. Com.* 418; *Shep. Touch.* 369; *Hurls. on Bonds* 103; 2 *Jarm. on Wills* 509; *Drayton* v. *Marshall, Rice's Eq.* 387.

The law stood in this way for two hundred years, when a desire to enlarge the rights of creditors induced the statute of *W. & M.,* putting a devisee on the same ground with an heir. This statute makes a devisee liable "in the same manner as the heir-at-law, notwithstanding the lands, tenements and hereditaments to him or them devised shall be aliened before action brought." By the fifth section the heir, as in regard of lands descending, which he has sold before any process was issued against him, such heir shall be accountable for such debt to the value of said lands so aliened, "saving that the lands *bona fide* aliened before action brought shall not be liable to such execution."

There was no other law upon the subject from *W. & M.,* A. D. 1682, to 5 *Geo. II.,* 1732, when parliament passed a law for the colonies, styled "An act for the more easy recovery of debts in the colonies," by which lands were made assets for the payment of debts. This statute provides that land shall be liable

to, and chargeable with, all just debts, and shall be assets for the satisfaction thereof, in like manner as real estate in England is liable for bonds, &c. It gives as to land " the like remedy and process " as before existed in reference to chattels.

Under these statutes necessarily construed together important questions soon arose. It was difficult to reconcile the statute 5 *Geo. II.*, with the doctrine that land descended to the heir or went direct to the devisee and was not assets in the hands of the executor for the payment of debts. The courts for a time hesitated, as will be seen by reference to the old rule of court as to what was necessary in a plea of *plene administravit. 22d Rule of Court; Miller* 414, 422; *Ashe* v. *Drennis*, 2 *Bay* 329. The most important of these questions were the following: As to when an execution against executors could levy and sell land devised or descended; and as to what was and what was not a *bona fide* alienation before the action brought, so as to place the lands beyond the reach of a judgment against the executors of ancestor.

It was early held that under the statute of 5 *Geo. II.*, executors, whose duty it is to provide for debts, must have some qualified right to control lands, so far as creditors are concerned, and in that view it was decided " that under a *fi. fa.* against the executor lands in his possession to be administered might be sold, provided the *fi. fa.* directed levy of the *lands*, goods and chattels of the testator in the hands of the executor *to be administered."* *D'Urphey* v. *Nelson*, 1 *Brev.* 289; *Martin* v. *Latta*, 4 *McC.* 128; *Gregory* v. *Forrester, McC.'s Ch.* 318; *Jones* v. *Wightman*, 2 *Hill* 579; *Rogers* v. *Huggins*, 6 *S. C.* 359. It will not be necessary to consider this question here, for the reason that Richmond Hill had been transferred by the devisee, John D. Magill, Junior, before Charles Betts recovered his judgment; and possibly, for the additional reason that he was one of the executors of the testator's will. It has been held by this court that a devise to one who is also executrix, is leviable while it remains in her possession. *Simons* v. *Bryce*, 10 *S. C.* 354.

The important question in the case is, whether the proceedings in bankruptcy—the assignment and sale thereunder and the

application of the proceeds to the judgment of the Bank of Charleston—amounted to a *bona fide* alienation before action brought, under the statute of *W. & M.,* so as to place Richmond Hill beyond the reach of the Betts judgment. In 1863, John D. Magill, Junior, got possession of his devise, when, probably, the personal property was sufficient to pay all the debts. The end of the war, with its disastrous results, came on. In March, 1866, he mortgaged Richmond Hill to the Misses Shields to secure a debt of his own. In April, 1868, after he had been in exclusive possession for some five years, upon his own application he was adjudged a bankrupt. In his schedule he included Richmond Hill, as "inherited from his father;" and among the debts were included that of Charles Betts and the judgment of the Bank of Charleston against the executors of his father.

On February 6th, 1869, the assignment was made to R. E. Fraser, assignee; and on April 18th an order for sale was made in the Bankrupt Court. All this occurred before the judgment of Betts was rendered against the executors of John D. Magill, Senior; but the actual sale was not made until November, after Betts had recovered judgment.

Was this an alienation within the meaning of the statute? An alienation is the conveyance of an estate. The legal definition of the term is "the act by which the title to an estate is voluntarily resigned by one person and accepted by another, in the forms prescribed by law." 2 *Bouv.*, § 1992; *Simons* v. *Bryce, supra.* John D. Magill, Junior, voluntarily went into bankruptcy and Richmond Hill was assigned for the payment of his debts, and those of his testator for which Richmond Hill was liable. As to the effect of that act, the bankrupt law declares "that as soon as said assignee is appointed and qualified, the judge, or when there is no opposing interest, the register shall, by an instrument under his hand, assign and convey to the assignee all the estate, real and personal, of the bankrupt, * * * and such assignment shall relate back to the commencement of said proceedings in bankruptcy, and thereupon, by operation of law, the title to all such property and estate, both real and personal, shall vest in said assignee, * * * and all his rights of action for property or estate, real and personal, and all his rights of redeeming such

property or estate shall, in virtue of the adjudication in bankruptcy and the appointment of an assignee, be at once vested in such assignee." *Bump* (6*th ed.*) 352. This was a transfer of all the title to the land which was in John D. Magill, Junior. If not so considered, the immediate result would be a conflict of jurisdiction. *Southern* v. *Fisher*, 6 *S. C.* 346.

Was this transfer *bona fide* in the sense of the statute? No action had been brought against John D. Magill, Junior, as devisee; and we think the mere fact that the alienation was made through the forms of the Bankrupt Court, cannot change its character. He transferred property which was his own, not impressed with the character of any trust, but subject only to the rights of creditors given by statute. The defence of the purchaser from a devisee under the statute of *W. & M.*, differs in several important particulars from the equitable defence of a purchaser for valuable consideration without notice. To sustain the latter plea according to principles of equity, the purchaser must be without notice, and the consideration must be valuable and actually paid. But under the statute of *W. & M.*, which created the liability of the devisee, and must, therefore, be looked to as measuring its extent, the only conditions are that the alienation must be *bona fide* and before action brought.

" If the devisee shall alien or make over " the land without fraud, it may be with notice and upon a good consideration, such as marriage. *Sprackman* v. *Timbrill*, 8 *Sim.* 253 ; (11 *E. Ch.* 424); *Richardson* v. *Horton*, 7 *Beav.* 124; (29 *E. Ch.*) In both these cases the settlement was made in consideration of marriage, and in both there was actual notice of the debts; but the provision made for their payment proved inadequate. *Held*, not sufficient to make the settlement fraudulent. In the latter case, Lord Langdale, master of the rolls, said : " I am of opinion that these circumstances thus barely appearing, do not afford any proof of fraud, or a want of *bona fides* in the execution of the settlement. The point decided is thus stated : ' A devised land to his son. The son, upon his marriage, settled the land upon his wife and children. *Held*, that the statute of 3 and 4 *W. & M.* does not charge the real estate descended or *devised*

with the creditor's debts, but makes the heir or devisee person-
ally liable to the value of the land.' "

No *new* consideration was necessary to support the alienation
other than the payment of the debts for which the devisee, John
D. Magill, Junior, was liable.

In our own late case of *Warren* v. *Raymond,* 12 *S. C.* 9, it
was held that a mortgage to secure a debt of the devisee was a
conveyance competent to work an alienation under the statute of
*W. & M.,* when the mortgagor was out of possession. In dis-
cussing this case, Willard, C. J., took occasion to explain the
cases of *Haynsworth* v. *Bischoff,* 6 *S. C.* 159, and *Richardson* v.
*Chappell, Id.* 146. In regard to the case last named, he says:
" This court held that *bona fide* alienation by the devisee defeated
the claims of creditors of the testator against the land devised;
but the referee is inaccurate in stating that case as deciding that
the alienee must show that the alienation was for valuable con-
sideration and without notice, in order to come within the statute
of 3 and 4 *W. & M.*"

We may add another feature of that case analogous to this.
One of the devisees who aliened was a qualified executor of the
will of the testator, yet it was held that he conveyed as devisee,
and that it was a *bona fide* alienation.

We conclude that the assignment of Richmond Hill in bank-
ruptcy, by John D. Magill, Junior, as a devise to him by his
father before judgment was rendered on the debt of Charles
Betts and before action was brought against Magill as devisee,
was an alienation in 'the sense of the statute; and that it was
*bona fide,* notwithstanding he had notice of the debt of Betts, and
there was no other consideration than the payment of his debts,
including those of his testator, for which Richmond Hill was
liable. This view is confirmed by the fact that the purchase
money of the sale made by order of the Bankrupt Court, was
applied to the judgment of the Bank of Charleston, which was
the oldest lien upon the estate of John D. Magill, Senior, the
deceased debtor, and had been recovered before alienation by the
devisee.

The judgment below is affirmed and the appeal dismissed.

SIMPSON, C. J., and McIVER, A. J., concurred.